IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 6, 1999 Session

**IN RE: ESTATE OF M. L. WAKEFIELD**

**Appeal from the Probate Court for Davidson County**
**No. 94P1917     Frank G. Clement, Jr., Judge**

**No. M1998-00921-COA-R3-CV - Filed December 10, 2001**

WILLIAM C. KOCH, JR., J., concurring in part and dissenting in part.

This appeal marks the end of an internecine struggle between the adult children of a deceased business executive and the two non-family co-executors of his estate. After the co-executors resigned prematurely under pressure from the probate court, they filed a final request for compensation for their work on behalf of the estate. The family opposed the request and insisted that the trial court should require the co-executors to disgorge the interim executor's fees they had already received. The probate court declined to award the co-executors additional fees but also declined to require them to disgorge their interim fees. In addition, the court directed one of the co-executors to refund $70,625 of the legal retainer he had collected from the deceased business executive's corporation.

I agree with the majority's conclusion that the co-executors are not entitled to a fee computed in accordance with the fee provisions in the decedent's will. I also agree with the majority's decisions that the co-executors are entitled to a reasonable fee for the work they actually performed as co-executors and that this fee should be based on the number of hours worked and a reasonable hourly rate for the services. However, I cannot agree with the majority's conclusion that the probate court somehow has jurisdiction to adjudicate what is essentially a shareholders' derivative claim regarding the legal fees paid to one of the co-executors by the decedent's corporation. Any dispute regarding these fees should be litigated in another forum.

**I.**

During his lifetime, Murrey Louis Wakefield was the president and sole owner of Feldkircher Wire Fabricating Company ("Feldkircher Wire"). He was 78 years old when he died in an automobile collision in December 1994. Four adult children survived Mr. Wakefield.[1] Mr. Wakefield's estate, valued at approximately $10.6 million, consisted of Feldkircher Wire, the real

---

[1]Mr. Wakefield had a fifth child who predeceased him. This child had two minor children.

property where the company's three manufacturing plants were located, equipment leased to the company, residences in Davidson and Williamson Counties, unimproved commercial property, and three farms with acreage totaling 650 acres.

Mr. Wakefield operated Feldkircher Wire by himself without a board of directors. He was a hands-on manager who personally oversaw all aspects of his company. Mr. Wakefield employed two of his children in his business but did not place them in executive management positions. For many years, he maintained professional relationships with a lawyer and an accountant who assisted him both with his business and with personal matters. Ronald H. Pursell, a Nashville lawyer, was on a $3,000 per month retainer from Feldkircher Wire, and Robert Whisenant, a Nashville accountant, provided accounting services, as needed, for Feldkircher Wire and Mr. Wakefield.

Mr. Wakefield began working on an estate plan with both Messrs. Pursell and Whisenant in the 1980s. He desired to ensure the continuation of Feldkircher Wire, but he was concerned that his children lacked the ability or experience that would be necessary to keep the company operating. He also desired to prevent his children from dissipating the assets he had worked so hard to accumulate and to avoid, or at least minimize, publically airing his personal finances. At the time of his death, Mr. Wakefield was considering forming an Employee Stock Ownership Plan ("ESOP") that would enable Feldkircher Wire's employees[2] to purchase the company.

After extensive discussions with Messrs. Pursell and Whisenant, Mr. Wakefield executed a will in October 1993. The will named Messrs. Pursell and Whisenant and Judith Wakefield Sandlin, one of Mr. Wakefield's daughters, as co-executors. It also created the M. L. Wakefield Family Trust and named Messrs. Pursell and Whisenant and Ms. Sandlin as the co-trustees. Other than several specific bequests directly to family members, the will directed that the bulk of Mr. Wakefield's property, including Feldkircher Wire, be placed in the M. L. Wakefield Family Trust. Mr. Wakefield's beneficiaries were entitled to the earnings from the trust, and, at the end of eleven years, the trust was to terminate and the corpus was to be distributed to the beneficiaries. The will also directed that Messrs. Pursell and Whisenant and Ms. Sandlin would become the board of directors of Feldkircher Wire following Mr. Wakefield's death with power to sell the company if they deemed a sale to be "financially advisable."

After Mr. Wakefield's death, his will was filed for probate, and Messrs. Pursell and Whisenant and Ms. Sandlin took on their responsibilities as co-executors, co-trustees, and co-directors of Feldkircher Wire. They filed an interim accounting for the period ending on November 30, 1995, which was approved by the probate court without objection in March 1996. However, shortly after Messrs. Pursell and Whisenant requested the court's permission to sell several tracts of real property, Ms. Sandlin joined her brothers and sisters in belatedly questioning the interim accounting and the proposed sale of real property. Despite this emerging disagreement, the adult beneficiaries did not object to the co-executors' request for interim executor's fees. In October 1996, the probate court entered an order, signed by counsel for all parties including the adult beneficiaries, awarding the co-executors an interim fee of $150,000 to be evenly divided among them.

---

[2] Feldkircher Wire's business was seasonal, and so it employed between 150 and 300 employees.

Signs of the discord between the non-family co-executors and the adult beneficiaries surfaced again in March 1997 when the adult beneficiaries opposed the co-executors' second interim fee request. During the next two months, the adult beneficiaries requested the probate court's permission to hire two business advisors to assist the estate in devising a long-term plan for the disposition of Feldkircher Wire. They also requested the court to determine whether challenging the co-executors' second interim fee request violated the "in terrorem" provision in Mr. Wakefield's will. After Messrs. Pursell and Whisenant requested the probate court's preliminary approval of the ESOP for Feldkircher Wire in June 1997, the adult beneficiaries opposed the ESOP and insisted that they desired to retain ownership and continue to operate Feldkircher Wire themselves.

During a status conference in late June 1997, the adult beneficiaries complained that the administration of their father's estate had been "marked by antagonism and tension" between them and Messrs. Pursell and Whisenant. The probate court suggested that Messrs. Pursell and Whisenant should voluntarily resign as co-executors and pointedly implied that they would be removed if they did not resign.[3] Not surprisingly, Messrs. Pursell and Whisenant immediately resigned as co-executors of Mr. Wakefield's estate, co-trustees of the M. L. Wakefield Family Trust, and co-directors of Feldkircher Wire. On July 3, 1997, the probate court entered an agreed order reciting that Messrs. Pursell and Whisenant had tendered their resignations and that "[a]ll parties in interest have agreed to . . . release, indemnify and . . . to hold harmless R. H. Pursell and Robert V. Whisenant from any and all duties, responsibilities, liabilities and/or obligations of either of them arising out of or in connection with their duties and obligations in each capacity." The court also appointed First American National Bank to replace Messrs. Pursell and Whisenant as co-executors and set a hearing on their pending motion for payment of executor's fees.

On August 1, 1997, Messrs. Pursell and Whisenant filed their final accounting and their final request for executor's fees. In addition to the $50,000 in interim fees each of them had received in October 1996, Mr. Pursell requested $85,166, and Mr. Whisenant requested $91,934. The adult beneficiaries took exception to the final accounting and also requested the probate court to determine "whether the totality of the fees charged by the former co-executors were necessary and reasonable." Following nine days of hearings between November 1997 and March 1998, the probate court ruled from the bench that Messrs. Pursell and Whisenant were not entitled to additional co-executor's fees and that they would not be required to disgorge the interim fees they had already received. The court also required Mr. Pursell to return $70,625 of the retainer fees his firm had received from Feldkircher Wire during the thirty months following Mr. Wakefield's death. Both Messrs. Pursell and Whisenant and the adult beneficiaries take issue with these decisions.

## II.
### THE CALCULATION OF THE EXECUTOR'S FEES

Throughout these proceedings, Messrs. Pursell and Whisenant have doggedly insisted that they are entitled to be compensated for their services as co-executors based on the compensation provision contained in Article I of Mr. Wakefield's will. With matching intensity, the adult

---

[3]The probate court's suggestion occurred when the court reporter was not present. However, the court later confirmed on the record that the suggestion had been made.

beneficiaries have advanced a host of arguments against the enforceability of the provision. Among other things, the adult beneficiaries insist that Mr. Wakefield was induced to include this provision in his will by the overreaching of Messrs. Pursell and Whisenant and that the provision is unenforceable because Messrs. Pursell and Whisenant did not arrange for Mr. Wakefield to obtain independent legal advice with regard to executor's fees.

Mr. Wakefield desired to include a provision in his will that would reduce the potential for disagreement regarding the compensation of the co-executors and co-trustees. After rejecting several proposed fee provisions, Mr. Wakefield eventually settled on the following provision directing

> that my Co-Executors and Co-Trustees herein shall be paid fees equal to those fees customarily charged by NationsBank in Nashville, Tennessee, or its successors for estate and trust administrative services.

The record shows that Mr. Wakefield decided to use this fee arrangement only after Messrs. Pursell and Whisenant had explained it to him and after Mr. Whisenant had made some calculations to estimate how much the executor's fees might be under this proposal.

Based on my reading of the record, I find no factual basis for concluding that either Mr. Pursell or Mr. Whisenant ever exerted undue influence over Mr. Wakefield with regard to the substantive provisions in his will. Nor do I find any colorable indication that Mr. Wakefield's mental or physical capacity were impaired. In fact, precisely the opposite is the case. By virtually all accounts, Mr. Wakefield was a self-possessed, driven person with a keen business intellect and an attention to detail. He articulated specific, reasonable goals for his estate planning and refined these goals over numerous conversations with Messrs. Pursell and Whisenant. Accordingly, I find no basis for undermining the will's fee arrangement simply because Mr. Wakefield did not receive independent legal advice regarding the method for compensating his two non-family co-executors. Imposing such a requirement will inevitably drive up the cost of obtaining a will and, under the facts of this case, would have been entirely unnecessary.

Like the majority, I have determined that there are three reasons why Messrs. Pursell and Whisenant are not entitled to have their executor's fees calculated in accordance with Article I of Mr. Wakefield's will. First, Messrs. Pursell and Whisenant were not entitled to a fee calculated in accordance with the NationsBank fee schedule because they resigned as executors before the estate closed. Second, there is evidence in the record that NationsBank would customarily negotiate to reduce its fee for large estates such as Mr. Wakefield's. Third, the record contains conflicting evidence regarding the types of services that would be classified as "extraordinary services" under the NationsBank schedule for which additional fees would be charged.

I find nothing improper about including a provision in a will that bases an executor's compensation on a fee schedule used by a financial institution. However, when such a provision is used, the will should contain other provisions (1) that address the computation of fees for executors who resign before the estate is closed, (2) that define the nature and type of services covered by the fee, and (3) that provide a method for computing the fee for extraordinary services that are not

normally part of the administration of an estate. The provision in Article I of Mr. Wakefield's will on which Messrs. Pursell and Whisenant rely does not contain any of these provisions, and, therefore, we have no reliable basis for determining what Mr. Wakefield's intentions would have been in these circumstances. However, in light of the picture of Mr. Wakefield painted by the testimony in this record, I venture to guess that he would never have agreed to full pay for only part of the work.

Executors are entitled to reasonable compensation for their services unless they agree to undertake the task without compensation. *In re Estate of Wallace*, 829 S.W.2d 696, 700-01 (Tenn. Ct. App. 1992). As a general matter, courts should give full effect to provisions in a will regarding executor's fees unless they conclude that the provision does not reflect the testator's intent. However, when a will does not contain a fee provision, the executor is entitled to a reasonable fee as determined by the court. *In re Estate of Perlberg*, 694 S.W.2d 304, 307 (Tenn. Ct. App. 1984). A will containing an unenforceable or invalid fee provision should be considered to be a will that does not contain a fee provision.

The probate court had the power to award Messrs. Pursell and Whisenant a reasonable fee because the fee provision in Article I of Mr. Wakefield's will was unenforceable. The court exercised its discretion by determining that the $50,000 interim fee Messrs. Pursell and Whisenant received in October 1996 fully compensated them for their services to the estate over a thirty month period of time. I cannot not square the probate court's conclusion with the unrebutted evidence regarding the amount of time Messrs. Pursell and Whisenant worked on the estate and the reasonable hourly rate they charged for their services. Accordingly, I concur with the majority's conclusion that, in addition to the interim fees already collected, Mr. Pursell is entitled to $9,487.50[4] in additional fees, and Mr. Whisenant is entitled to $12,037.50[5] in additional fees.

### III.
#### THE DISGORGEMENT OF FELDKIRCHER WIRE'S RETAINER

The probate court also ordered Mr. Pursell to repay $70,625 of the retainer he had collected from Feldkircher Wire during the thirty months following Mr. Wakefield's death. The decision appears to be based on two conclusions. First, the probate court observed that continuing the long-standing retainer agreement with Feldkircher Wire after Mr. Wakefield's death was somehow improper because Mr. Pursell joined the board of directors of Feldkircher Wire. Second, the probate court noted that Mr. Pursell's time records for the period indicated that he personally spent 154.6 billable hours providing legal services to the company and that the bill for these hours, at Mr. Pursell's normal hourly rate, would have been $19,375.[6] Accordingly, the probate court required Mr.

---

[4] 475.9 hrs. × $125/hr. = $59,487.50 - $50,000 = $9,487.50.

[5] 496.3 hrs. × $125/hr. = $62,037.50 - $50,000 = $12,037.50.

[6] The trial court must have arrived at the $19, 375 amount by rounding Mr. Pursell's billable hours up to 155 and then multiplying by $125/hr.

Pursell to disgorge the difference between the retainer and the normal charge for the hours that he actually spent working on Feldkircher Wire's business.

A probate proceeding provides a vehicle for the prompt and economic administration of a decedent's estate. Its purposes are (1) to determine the "character and validity" of the will,[7] (2) to identify and marshal the decedent's assets and property,[8] (3) to pay the decedent's debts,[9] and (4) to distribute the balance of the decedent's estate in accordance with his or her will.[10] The proceeding has an ecclesiastical rather than common-law origin and is essentially statutory in nature. *Petty v. Call*, 599 S.W.2d 791, 793 (Tenn. 1980); *Buchanan v. Matlock*, 27 Tenn. (8 Hum.) 389, 391-96 (1847). Because probate proceedings are statutory in nature, courts exercising probate jurisdiction have only the subject matter jurisdiction and power conferred on them by constitution or by statute, or necessarily incidental to the exercise of the jurisdiction and powers specifically granted. *Meighan v. U. S. Sprint Communications Co.*, 924 S.W.2d 632, 639 (Tenn. 1996); *Dishmon v. Shelby State Cmty. College*, 15 S.W.3d 477, 480 (Tenn. Ct. App. 1999).

The probate court and the majority have concluded that the adult beneficiaries of Mr. Wakefield's estate can use the probate proceeding to adjudicate a claim essentially belonging to Feldkircher Wire. This decision is predicated on their conclusion that this claim was essentially brought on behalf of the beneficiaries because all the capital stock in Feldkircher Wire is an asset of the estate. This reasoning overlooks the fact that Feldkircher Wire is a free-standing legal entity that is separate from the estate.

There is no question that the stock in Feldkircher Wire owned by Mr. Wakefield when he died became an asset of his estate. 2 Jack W. Robinson & Jeff Mobley, *Pritchard on the Law of Wills and Administration of Estates* § 627 (5th ed. 1994). Thus, following Mr. Wakefield's death, his estate succeeded to his ownership of the stock and became a stockholder of the corporation. *Western Sur. Co. v. Wilson*, 484 S.W.2d 45, 48 (Tenn. Ct. App. 1972) (holding that the decedent's personal representative succeeds to his or her personal property); *First Nat'l Bank v. Howard*, 42 Tenn. App. 347, 351, 302 S.W.2d 516, 518 (1957) (same). However, the estate's power is only that of a shareholder. *In re Winder's Estate*, 221 P.2d 193, 194 (Cal. Dist. Ct. App. 1950). It did not become the corporation following Mr. Wakefield's death.

The claim involving the legal retainer fees Mr. Pursell collected from Feldkircher Wire during the thirty months following Mr. Wakefield's death is, if anything, a claim belonging to the

---

[7]*Zuccarello v. Erwin*, 2 Tenn. App. 491, 498 (1926). Of course, the circuit court also plays a role in determining a will's validity if the will is contested. *Bearman v. Camatsos*, 215 Tenn. 231, 238, 385 S.W.2d 91, 94 (1964); *Cooper v. Austin*, 837 S.W.2d 606, 610 (Tenn. Ct. App. 1992).

[8]Tenn. Code Ann. §§ 30-2-301(a), -601(a) (2001); *McFarlin v. McFarlin*, 785 S.W.2d 367, 370 (Tenn. Ct. App. 1989); *Bishop v. Young*, 780 S.W.2d 746, 750-51 (Tenn. Ct. App. 1989).

[9]Tenn. Code Ann. §§ 30-2-319, -402(a) (2001).

[10]Tenn. Code Ann. § 30-2-701 (2001); *McFarlin v. McFarlin*, 785 S.W.2d at 370; *State ex rel. Burrow v. Cothron*, 21 Tenn. App. 519, 529-30, 113 S.W.2d 81, 87 (1937).

corporation. As the shareholder of Feldkircher Wire, Mr. Wakefield's estate could file a shareholder's derivative action[11] against Mr. Pursell to recover these fees. Such a claim, however, must be pursued in a proceeding other than the proceeding to set up and probate the decedent's will. *See, e.g., Christiansen v. Rolich Corp.*, 909 S.W.2d 823, 825 (Tenn. Ct. App. 1995) (holding that a decedent's personal representative could bring a derivative action on behalf of a corporation because a portion of the corporation's stock was in the estate).

In light of these authorities, I would hold that a court exercising probate jurisdiction does not have the subject matter jurisdiction to adjudicate a shareholder's derivative claim simply because some or all of the corporation's stock is in the hands of an estate within the probate court's jurisdiction.[12] Accordingly, I would hold that the probate court exceeded its jurisdiction when it ordered Mr. Pursell to disgorge a portion of the retainer fee he had received from Feldkircher Wire following Mr. Wakefield's death. If this claim is to be pursued, it should be pursued in another forum either by Feldkircher Wire or by Mr. Wakefield's estate for the benefit of Feldkircher Wire.

_____
WILLIAM C. KOCH, JR., JUDGE

---

[11]A shareholder's derivative action is one brought by one or more shareholders on a corporation's behalf to redress injury sustained by or to enforce a duty owed to a corporation. *Lewis v. Boyd*, 838 S.W.2d 215, 221 (Tenn. Ct. App. 1992).

[12]Contrary to the general law vesting probate jurisdiction in the chancery courts, Tenn. Code Ann. § 16-16-201 (1994), the Seventh Division of the Circuit Court for the Twentieth Judicial District exercises exclusive jurisdiction over the probate of wills and the administration of estates in Davidson County. Act of May 17, 1995, ch. 62, § 1, 1995 Tenn. Priv. Acts 127. Even though the circuit court has subject matter jurisdiction to adjudicate shareholder derivative actions, it cannot do so when it is exercising its special probate jurisdiction because no statute relating to the probate of wills or the administration of estates vests a probate court with subject matter jurisdiction over shareholder derivative claims. By their very nature, these claims belong to a corporation and cannot, therefore, be considered assets of a deceased stockholder's estate.